ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 17 2008

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

| | | |
|---|---|---|
| DAMON SMITH | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| | ) | FILE NO. _____ |
| | ) | |
| JAMES PEFANIS, AME FINANCIAL | ) | 1 08-CV-1042 |
| CORPORATION and GEORGIA MUTUAL | ) | |
| MORTGAGE CORPORATION | ) | |
| | ) | JURY TRIAL |
| | ) | DEMANDED |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff Damon Smith ("Smith"), for his Complaint against Defendants,

shows the following:

**OVERVIEW**

1.

This is an action brought by Smith against his former joint employers, AME

Financial Corporation and Georgia Mutual Mortgage Corporation, and their

respective at least 50% owner, President and CEO James Pefanis ("Pefanis"), for violations of Title VII of the Civil Rights Act of 1964 and Georgia law.

## JURISDICTION AND VENUE

2.

This is a civil action over which original, federal question jurisdiction is vested in this Court by virtue of 28 U.S.C. § 1331 and The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and supplemental jurisdiction is vested in this Court under 28 U.S.C. § 1367.

3.

Venue is appropriate in this Court under 28 U.S.C. § 1391 as this action is brought in a judicial district in which the Defendants reside or may be found at the time the action is commenced and in which the discriminatory, unlawfully harassing and tortious acts described below occurred. Further, Plaintiff resides and was employed by Defendants within the Northern District of Georgia.

## PARTIES, JURISDICTION AND VENUE

4.

Smith is an individual currently residing at 705 Cirrus Drive, Alpharetta, Georgia 30005.

5.

Pefanis is an individual currently residing at 6835 Matt Highway, Cumming, Georgia, 30028. He is currently at least a 50% owner and the Chief Executive Officer and Chief Financial Officer of Defendant AME Financial Corp ("AME"). He is also at least a 50% owner and is the Chief Executive Officer of Georgia Mutual Mortgage Corporation ("Georgia Mutual"). Pefanis can be served with process at either his residential address, or at the principal place of business of AME.

6.

AME purports to be a for-profit limited liability corporation incorporated in the State of Georgia. AME purports to be in the business of providing mortgage brokerage services. According to records maintained by the Georgia Secretary of State, AME maintains its principal place of business at 6455 Shiloh Road, Suite D, Alpharetta, GA 30005. AME can be served with process by serving its CEO Pefanis, at AME's stated principal place of business or by serving AME's Registered Agent, Ron D. Eckland, at 4036 Wetherburn Way, Norcross, Gwinnett County, GA 30092. AME is an employer within the meaning of Title VII.

7.

Georgia Mutual purports to be a for-profit limited liability corporation incorporated in the State of Georgia.  Georgia Mutual purports to be in the business of providing mortgage brokerage services.  Georgia Mutual is a joint employer of employees at AME.  For example, Georgia Mutual pays AME employees certain payments in connection with their employment such as bonuses and car allowances.  Pefanis uses Georgia Mutual to funnel funds and monies to and from himself and employees at AME.  According to records maintained by the Georgia Secretary of State, Georgia Mutual maintains its principal place of business at 4036 Wetherburn Way, Norcross, Gwinnett County, GA 30092.  Georgia Mutual can be served with process by serving Ron D. Eckland at Georgia Mutual's stated principal place of business.

8.

Defendants jointly employed Smith from September 11, 2007 to November 30, 2007 when he was discharged by Defendants because he resisted and complained about Pefanis' gross sexual harassment of him.

9.

Each of the Defendants is subject to the jurisdiction of this Court, and venue of this action is proper in this Court.

## FACTUAL BACKGROUND

10.

As indicated above, AME/Georgia Mutual purport to be in the business of providing various financial services – including mortgage brokerage services (hereinafter "Joint Employer"). While the Joint Employer does exist, in part, to provide these services, it also exists for an unlawful purpose. As set forth below, the Joint Employer exists, in part, to provide its 50% owner and CEO, Pefanis, an opportunity and platform to engage in gross sexual behavior against employees, including sexual harassment and sexual assault. As set forth below, Pefanis' sexual misconduct at the Joint Employer is so pervasive, brazen and outrageous that the only logical conclusion is that one of the primary business missions of the Joint Employer (which is an alter ego of Pefanis) is to provide Pefanis with an outlet to engage in his sexual misconduct.

11.

On September 11, 2007, Defendants hired Smith as an Account Executive. At the time that he was hired, Smith had no idea about the sexual misconduct that Pefanis routinely engaged in – and that was both tolerated and enabled by AME and Georgia Mutual. However, since his employment ended at the Joint Employer and since he filed his EEOC charge, Smith has learned that Pefanis had engaged in

5

a long and widespread practice of sexual harassment and battery on employees before Smith was hired.

## 12.

Prior to Smith being hired, Defendants were well aware of Pefanis' gross history of sexual and racial harassment in the workplace.  For example, in 2004, two former Joint Employer employees, Erica Tolbert ("Tolbert") and Farrah Bowers ("Bowers");  each filed charges of sexual and racial harassment against AME based on conduct and statements by Pefanis in the workplace.

## 13.

Among other things, Tolbert and/or Bowers (who are African-American females) alleged in writing in their EEOC charges the following statements and conduct by Pefanis in their workplace:

- Pefanis regularly exposed his penis at employee meetings

- Pefanis dropped his pants and exposed himself specifically to Bowers

- Pefanis grabbed at Bowers' breast and stated in front of others, "You know you want to try to grab that big black titty"

- Pefanis Touched Bowers in the vaginal area and grabbed her buttocks

- Pefanis called Tolbert "colored girl" and "nigga" and, when she protested, he told her to "get over it"

- Pefanis regularly greeted African-American employees in the office by stating, "Good morning coloreds, masta is here to take care of the white people."

- Pefanis told a group of African-American employees that the company was becoming too African-American

- Pefanis told Bowers, "You can't trust coloreds, you know how these people are."

- Pefanis told Bowers, " I take care of the niggas well. I can't talk about it now.  You coloreds always want to try and get your forty acres and a mule"

14.

AME responded to the EEOC charges filed by Tolbert and Bowers with lengthy written position statements.  In both of AME's position statements to the EEOC, AME included a section entitled "RESPONSES TO ALLEGATIONS" and a subsection of that section entitled "*Hostile Work Environment Allegation.*"  In that subsection, AME **did not deny a single one** of the allegations of sexual and racial conduct and statements by Pefanis.  Indeed, AME admitted that Pefanis "made some comments and engaged in some actions that would be considered inappropriate."  In other words, AME did not deny and effectively admitted that Pefanis exposed himself and engaged in regular racial slurs but simply acknowledged that such statements and actions were "inappropriate."

15.

Despite AME's admissions to the EEOC that Pefanis had engaged in the egregious sexual and racial harassment alleged, AME did nothing to Pefanis.

AME retained Pefanis in his role controlling all employees and enabled him to continue his pattern of harassment, assault and battery of employees.

16.

Not surprisingly, emboldened by the Joint Employers admission and ratification of his illegal conduct, Pefanis continued his pattern of sexual comments, harassment, and battery. After filing his EEOC charge, Smith learned of the lawsuit filed by former Joint Employer employee Evangelina Forsberg ("Forsberg") against the Defendants in this Court.

17.

Smith did not know of Ms. Forsberg when he filed his EEOC charge as she left employment at the Joint Employer before he started his employment at the Joint Employer.  However, upon learning of her allegations, he saw that Pefanis had a pattern of harassment and battery of employees before he was hired.

18.

In order to humiliate and sexually demean her, Pefanis routinely made unlawful and offensive sexual statements to Forsberg, telling her things such as: (a) she had "small titties;" (b) she should "go get some [breast] implants, and she might make some money;" (c) she was a "slut;" (d) she had a "small butt;" (e) he didn't understand how small-framed women were able to have sex with large men; and (f) other similar outrageous statements.

8

19.

In addition to what she witnessed, Forsberg was informed of other egregious harassment by Pefanis. For example, one employee stated in the presence of Pefanis and Forsberg that Pefanis had "put your finger up that little boy's butt." Forsberg later learned that it had been reported that Pefanis and a male employee had committed sexual assault and battery on a male employee or independent contractor of AME and an employee of AME's and Georgia Mutual's agent who operated adjacent to AME's offices. Pefanis also grabbed and groped male employees to simulate sex and for sexual gratification.

20.

Pefanis' repeated and pervasive harassment of Forsberg was not limited to sexually inappropriate statements. He also repeatedly engaged in inappropriate sexual misconduct, including: (a) touching and attempting to touch Forsberg; (b) attempting to look down her shirt at her breasts; and (c) other similar sexual misconduct. He repeatedly committed sexual battery on Forsberg – grabbing her and thrusting into her buttocks to simulate sex, pinning her against the wall to simulate sex, and grabbing her and, with one hand, holding her vagina and commenting about it in a gross way. He then invited another male employee to do

the same thing.  The Joint Employer failed to take any action and encouraged
Pefanis to continue his pattern of illegal conduct on employees.

21.

With all of this history unknown to him, Smith began his employment as an
Account Executive at the Joint Employer on September 11, 2007.    Several days
after his hire, Pefanis and Joint Employer manager Robert Anderson called Smith
into Pefanis' office.  Pefanis told Smith that the background check run by the Joint
Employer on Smith reported that Smith had been convicted of two crimes.  Smith
stated that the report was accurate and that he convictions were several years
earlier (1999).   Smith stated he had not been involved in any criminal conduct
since 1999 and had been employed in the mortgage business in Colorado before
getting married, and then moving to Georgia in May 2006.

22.

While Smith at this time believed that he might be released by the Joint
Employers because of his past convictions, he was not.  Pefanis made the decision
to retain Smith and told him he would do so because he believed Smith was an
asset to AME and that he liked Smith's personality.  Pefanis asked Smith to submit
a background check from a previous employer that did not include the past
conviction.  In compliance with Pefanis' direction, Smith gave the Joint Employer
a background check from another source that had been done in January 2007 that

10

did not report any past conviction. Smith then continued his employment with the Joint Employer.

### 23.

Smith at all times performed his job well and was never subject to discipline until he was later terminated for unlawful reasons.

### 24.

Shortly after his employment began, Pefanis began to openly ask Smith to have sex with him. On occasion, he would tell Smith that Smith owed him sex as a favor for hiring him despite his background check. Pefanis practice is to prey on people who have problems so that he can take advantage of those problems to seek to coerce sex. He threatens and blackmails people to obtain sex or other improper gain.

### 25.

Pefanis frequently offensively touched Smith. He smacked him on the buttocks and said, "Nice ass. Let's try it." He asked Smith if he had a big penis. He told Smith that he did not like them too big but he would like to see Smith's penis for himself.

### 26.

Pefanis on several occasions grabbed Smith from the back and embraced him, thrusting his crotch into his backside to simulate anal sex. While doing this

he said things, such as, "We should have sex" and "I will make sure you enjoy it." Pefanis engaged in this context in the presence of other employees of the Joint Employer – including the Joint Employer's HR manager.  Pefanis would state to Smith, "Down low brother."  When it was necessary that Smith enter Pefanis' office, Pefanis would ask Smith to lock his office door while Smith was in the office "so no one will see."   Smith was completely disgusted and offended by Pefanis' statements and conduct.  Smith told Pefanis that he was offended by his statements and actions and Pefanis ignored Smith's protests and continued them.

27.

Pefanis told Smith (who is African-American) that he liked tall black men and that he wanted to have sex with manager Robert Anderson and Smith together. He stated he would close his office door and the three of them could do it right there.  In a blatant act of *quid pro quo* harassment, Pefanis told Smith he did him a favor by overlooking his background check and that he should consent to sex to return the favor and be grateful for it.

28.

Pefanis was sexually vulgar and offensive verbally to and in the presence of Smith in a regular basis in the office.  Pefanis on several occasions touched Smith's buttocks and ran his fingers up Smith's thigh.

12

29.

Smith consistently rejected Pefanis' sexual advances and demands.  Smith

repeatedly told Pefanis that he was not gay and that he was married to a woman

and was straight.  Pefanis did not accept that response, told Smith that he should

"come out of the closet" and continued to demand sex from him.

30.

At a company lunch, Pefanis sat across from Smith and began to talk to

Smith about his sex toys and how he did not enjoy giving one of the toys a "blow

job" because "it was not the real thing."  When Smith made his objection to

Pefanis' comments obvious, Pefanis questioned whether Smith "even liked sex."

Pefanis made these statements in front of two Joint Employer managers –

including the HR Manager Phyllis Lee and Robert Anderson.   After the lunch, Lee

and Anderson apologized to Smith for Pefanis' conduct.   Once again, Lee and

Anderson concluded that there was nothing they could do about Pefanis'

outrageous and unlawful conduct and therefore did nothing to stop or correct it but

instead enabled and ratified it for the Joint Employer.

31.

Amazingly, the Joint Employer's written sexual harassment policy (which

was in no way effective) told employees that they should report any sexual

harassment complaint to Pefanis.   With Smith's protests being ignored by Pefanis,

13

shortly after the first incident of Pefanis' sexual harassment towards him, Smith

went to the office of HR manager Phyllis Lee and complained about it.  Lee told

Smith, "That's just Jim.  He has always been like that."   Thus, on behalf of the

Joint Employer and HR, Lee told Smith he was going to have to simply tolerate

Pefanis' unlawful conduct if he wanted to continue to work there.  Thus, the Joint

Employer told Smith that  submitting to sexual conduct and advances was a term

and condition of  Smith's employment at Joint Employer.  Smith repeatedly

complained to Lee about Pefanis and each time she told him he had to tolerate

Pefanis and that was just the way Pefanis was.

32.

On one occasion, Pefanis made a very direct demand for sex from Smith.

Smith told Pefanis in very certain terms that he would not have sex with him.

Pefanis was angry.  Manager Anderson told Smith afterwards that Pefanis now

wanted Smith gone.  Pefanis days later fired Smith.  He gave a pretextual reason

for poor performance but it was obviously because Smith had not consented to

having sex with Pefanis and because he opposed Pefanis' sexual harassment and

tortious conduct.

33.

Pefanis has sexually assaulted, harassed and committed battery on numerous

employees at the Joint Employer.  The Joint Employer is well aware of these

unlawful actions and tells employees they must submit to his sexual conduct if they want to remain employed. Smith chose not to tolerate Pefanis' criminal acts and he was terminated for it.

34.

For example, Pefanis told another male employee in 2007:

- "I want to put your cock in my mouth"

- "I am going to get you drunk and stick your penis in my ass and you will like it."

When Pefanis learned that this employee might claim sexual harassment, Pefanis told him, "What do you think you are doing threatening me with sexual harassment?" Pefanis then fired the employee. On another occasion, Pefanis grabbed the crotch of a male employee. The male employee slammed the body of Pefanis and Pefanis fired him. Pefanis' gross sexual assaults are well-known at AME.

35.

Smith has understandably suffered damages, including physical impact damages, pecuniary damages (including loss of wages and other special damages) and emotional distress as Defendants intended for him to do.

15

36.

On December 19, 2007, Smith filed a Charge of Discrimination against AME alleging unlawful sexual harassment and discrimination and unlawful retaliation. Georgia Mutual is a joint employer and alter ego of AME. On February 4, 2008, AME submitted a position statement to the EEOC in response to Smith's EEOC charge. In that statement, AME stated that, after being apprised of his Joint Employer-obtained background check, Smith told AME that the report was mistaken and that Smith submitted the previous background check. Such an assertion is of course incredible. An employer would obviously never ignore its own background check and take a contrary one given it by the applicant unless it wanted to employ the applicant for some other (here sexual) reason. Thus, the Joint Employer provided knowingly false information to the federal government in its statement to the EEOC in response to Smith's EEOC charge.

37.

On March 7, 2008, Smith received from the EEOC a right to sue letter on his EEOC charge. This lawsuit was filed within 90 days of the date Smith received that Notice of Right to Sue.

38.

All administrative prerequisites for filing a Title VII claim against the employer Defendants have been fully satisfied by Smith.

16

## CLAIMS

## COUNT ONE

**(Unlawful Sexual Harassment And Discrimination Under Title VII)**

39.

Plaintiff repeats and incorporates by reference all of the allegations set forth in paragraphs 1 through 38 above as if set forth fully herein.

40.

Under Title VII it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions or privileges of employment because of such individual's sex.

41.

AME and Georgia Mutual separately and jointly discriminated against Plaintiff because of his sex through sexual harassment (both hostile environment and tangible job action sexual harassment), and the tangible job actions and adverse employment actions taken against him.

42.

As a result of the unlawful conduct and the violations of Title VII's prohibition against sex discrimination, Plaintiff has suffered losses, including but not limited to, the loss of employment, substantial loss of pay and benefits, and loss of reputation and emotional distress.

43.

Plaintiff is entitled to a declaratory judgment that the actions of AME and

Georgia Mutual violated Title VII and is entitled to other remedies, including, but

not limited to, back pay and benefits, front pay and benefits, compensatory

damages, punitive damages, interest, attorneys' fees and costs.

## COUNT TWO

### (Torts Of Negligent Hiring and Retention)

44.

Plaintiff repeats and incorporates by reference all of the allegations set forth

in paragraphs 1 through 43 above as if set forth fully herein.

45.

AME and Georgia Mutual negligently hired and/or retained Pefanis and

other employees of AME and Georgia Mutual with knowledge of Pefanis'

admitted practices of sexual harassment, assault and battery.   In this regard,

Defendants AME and Georgia Mutual breached their duty to exercise ordinary care

not to hire or retain an employee they knew or should have known posed a risk of

harm to others where it was reasonably foreseeable from the tendencies,

propensities, and/or actions of the individual hired and/or retained that he could

cause harm to Plaintiff and/or others at AME and Georgia Mutual.

46.

Plaintiff has suffered damages from Defendants' tortious conduct, including economic, pecuniary and emotional distress damages.

## COUNT THREE

### (Assault and Battery)

47.

Plaintiff repeats and incorporates by reference all of the allegations set forth in paragraphs 1 through 46 above as if set forth fully herein.

48.

Defendant Pefanis engaged in repeated assault and battery of Plaintiff. These torts were committed in the scope of Pefanis' employment with the Joint Employer and in the furtherance of the Defendants' business which, as described above, was set up for the express purpose of providing Pefanis a platform and outlet for his sexual conduct.

49.

The actions of Pefanis caused Plaintiff to reasonably apprehend a violent injury from the unlawful acts.

50.

Pefanis touched Plaintiff in a harmful and offensive manner to cause him physical harm and to cause him to suffer insulting or provoking contact.

51.

Defendants AME and Georgia Mutual are liable to Plaintiff for the assault and battery committed by Pefanis.

52.

Plaintiff has suffered damages from Defendants' tortious conduct, including economic, pecuniary and emotional distress damages.

## COUNT FOUR

### (Intentional Infliction of Emotional Distress)

53.

Plaintiff repeats and incorporates by reference all of the allegations set forth in paragraphs 1 through 52 above as if set forth fully herein.

54.

The actions of Defendants against Plaintiff described above and otherwise were designed to inflict severe emotional distress upon Plaintiff and did inflict severe emotional distress upon Plaintiff. Defendants' conduct amounted to the tort of intentional infliction of emotional distress under Georgia law that caused Plaintiff to suffer direct and proximately caused injuries and damages.

## COUNT FIVE

### (Violations of O.C.G.A. § 34-2-10)

55.

Plaintiff repeats and incorporates by reference all of the allegations set forth in paragraphs 1 through 54 above as if set forth fully herein.

56.

O.C.G.A. § 34-2-10 provides:

Every employer shall furnish employment which shall be reasonably safe for the employees therein, shall furnish and use safety devises and safeguards, shall adopt and use methods and processes reasonably adequate to render such an employment and place of employment safe, and shall do every other thing reasonably necessary to protect life, health, safety, and welfare of such employees.

57.

Defendants' actions summarized and set forth herein violated of O.C.G.A. § 34-2-10.   Plaintiff was placed in fear for his physical safety because of the actions and inactions of the Defendants.

58.

Plaintiff has suffered damages from Defendants' tortious conduct, including economic, pecuniary and emotional distress damages.

## COUNT SIX

### (Unlawful Retaliation In Violation of Title VII)

59.

Plaintiffs repeat and incorporate by reference all of the allegations set forth in paragraphs 1 through 58 above as if set forth fully herein.

60.

Under Title VII it is unlawful for an employer to retaliate against a former employee because of that individual's engagement in activity protected by Title VII.

61.

Plaintiff engaged in protected activity under Title VII, including, but not limited to, his opposition to Defendants' violations of Title VII.   Defendants retaliated against Plaintiff for that protected activity, including by terminating his employment.

62.

As a result of the unlawful conduct of the violations of Title VII's prohibition against retaliation, Plaintiff had suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays:

22

A.   That a declaratory judgment be issued declaring that the actions of AME and Georgia Mutual violated Title VII and that Plaintiff be awarded injunctive relief under Title VII;

B.   That judgment be entered in favor of Plaintiff and jointly and severally against AME and Georgia Mutual awarding Plaintiff all remedies available under Title VII, including but limited to, front pay and benefits, back pay and benefits, compensatory damages, punitive damages, interest, fees, and costs;

C.   That Plaintiff be awarded his costs and attorneys fees for all costs and fees incurred in connection with this matter;

D.   That Plaintiff be awarded judgment of compensatory and punitive damages on his claims under Georgia law;

E.   That Plaintiff be awarded such other and further relief that the Court deems just and equitable;

F.   That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have fully remedied the practices complained of and are determined to be in full compliance with the law and that all amounts awarded are paid to Plaintiff by Defendants.

## PLAINTIFF DEMANDS A TRIAL BY JURY IN THIS ACTION

Respectfully submitted,

_____
Thomas J. Munger
Georgia Bar No. 529609

MUNGER & STONE, LLP
999 Peachtree Street, N.E.
Suite 2850
Atlanta, Georgia 30309
Telephone: (404) 815-0829
Facsimile:  (404) 815-4687

_____
Benjamin A. Stone
Georgia Bar No. 683850

MUNGER & STONE, LLP
999 Peachtree Street, N.E.
Suite 2850
Atlanta, Georgia 30309
Telephone: (404) 815-0933
Facsimile:  (404) 815-4687