**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| Damon Smith, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:08-cv-01042-JOF-RGV |
| James Pefanis, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## **OPINION & ORDER**

This matter is before the court on Plaintiff's motion to compel the production of documents directed at Ron Eckland [157].

## **Background**

For the purposes of evaluating Plaintiff's motion to compel, the court finds it useful to review in careful detail the history of Mr. Eckland's participation in this litigation. The court has noted a general pattern in Defendants' and Mr. Eckland's responses to various discovery orders and allegations made by Plaintiff. Plaintiff asks for certain discovery, Mr. Eckland responds that he has produced such discovery or that it is not necessary for him to do so. The court issues a ruling and Mr. Eckland feigns some attempt at complying with the order, but never reaches the level of full production. Plaintiff points out the deficiencies in

Mr. Eckland's production or outright inconsistencies in his assertions and Mr. Eckland proffers a new set of reasons for his behavior. The constantly shifting sand of Mr. Eckland's positions has made it enormously difficult for the court to reach the merits of important issues in the litigation. For this reason, the court wishes to document the efforts made by the court and Plaintiff to secure Mr. Eckland's full and forthright responses to discovery requests and orders of the court.

On July 16, 2008, Plaintiff issued separate Rule 45 subpoenas to the Atlanta Real Estate Law Group, LLC and Ron Eckland as well as other entities not at issue in this order. Mr. Eckland is the sole principal of the Atlanta Real Estate Law Group, the law firm which acts as counsel for AME's mortgage closings. Those subpoenas sought a variety of financial records. On July 31, 2008, Defendants' counsel filed an objection to the subpoenas on behalf of Ron Eckland, and Defendants filed their own motion to quash the subpoenas.[1]

---

[1] In Mr. Eckland's objection, he asserts that "[w]hile he is Mr. Pefanis' partner, he keeps separate bank accounts" and his confidential records, therefore, would have "no bearing or relevance on any issues in the Smith case." *See* Objection, Docket Entry [36], at 1. In Defendants' motion to quash, they assert that the "Smith case is a sexual harassment case and involves matters that having not[h]ing to do with the [sic] Ron Eckland or his law firm or its income or assets or former employees. Mr. Eckland is Mr. Pefanis' life partner and that fact hardly makes his or him [sic] law firm's financial or other records fair game for discovery. Neither does the fact that Plaintiff wrongly believes that Mr. Pefanis fraudulently transferred property to Mr. Pefanis. [sic]" *See* Motion to Quash, Docket Entry [37], at 2; *see also* Objection filed by Atlanta Real Estate Law Group, Docket Entry [38]. As the real facts have come slowly to light, the merit of these objections continues to diminish.

2

On August 12, 2008, Plaintiff filed a motion to enforce the subpoenas. *See* Docket Entry [41]. In that motion, Plaintiff asserts that "Eckland indisputably and unlawfully helped Pefanis steal away his personal assets in this case in order to avoid discovery and judgment. Among other things, Eckland accepted a fraudulent conveyance of property valued at more than $3 million from Pefanis. Eckland then mortgaged that property to rob it of its value – and placed the cash in locations he refused to identify during deposition." *Id.* at 2.

The factual basis for this assertion is that on April 23, 2008, hours before Defendant Pefanis gave a deposition in *Forsberg*, Defendant Pefanis transferred to Mr. Eckland numerous pieces of real property that Defendant Pefanis had jointly owned. Defendant Pefanis then testified at his deposition that he had only $3,000 cash to his name. *See* Pefanis *Forsberg* (April 23, 2008) Depo., at 22, 138-39.

The quitclaim deeds for those transfers were filed on April 23, 2008. In deposition testimony and his testimony at trial, Mr. Eckland offered that although he and Mr. Pefanis were not able to marry, they had adopted a child but as the law currently stood, only one of them could be the legal guardian of the child. Because Defendant Pefanis was the legal guardian of the child, they decided to transfer all of their property (which had heretofore been held jointly by Defendant Pefanis and Mr. Eckland) into Mr. Eckland's name alone. Mr. Eckland testified that the two made this decision in May 2007, and made the actual

3

transfers via quitclaim deed on June 1, 2007, but "forgot" to file the deeds in the Superior Court of Fulton County until the day before Defendant Pefanis's deposition. They "forgot" to file these deeds despite the fact that Mr. Eckland is a real estate closing attorney surely versed in the vital significance of such records to the chain of title. The fact that Mr. Eckland and Defendant Pefanis purchased a property (the 26th Street property) together on May 30, 2007, and the deed for that property lists Defendant Pefanis as the sole owner also calls into question Mr. Eckland's explanation for transfer of the property assets.

The status of one of those pieces of property has evolved in this litigation into a tale of epic proportions with ever-changing explanations depending on what documentary evidence Plaintiff has managed to painfully extract from various financial records. In his deposition, Mr. Eckland testified that he took out a $150,000 mortgage on property located at 2362 River Ridge Road, Martin, Georgia 30557. Since the date of that deposition, Plaintiff has been attempting to learn where the proceeds of that mortgage went. It would seem to be a simple question, but where Mr. Eckland is involved, nothing is simple. Despite the fact that Mr. Eckland had purportedly taken out the mortgage only three months earlier, he simply could not recall exactly where the money went. He did testify that he spent $115,000 on personal debt on credit cards and to creditors he could not recall other than Chase and Bank of America. *See* Eckland *Smith* (July 1, 2008) Depo., at 69, 70, and 72. He also paid $10,000 for horse expenses, including veterinary bills but that he could not

4

AO 72A
(Rev.8/82)

recall exactly to whom he had paid that money. *Id.* at 73. And he still held $25,000. *Id.*, at 74 and 75. Defendants blamed Mr. Eckland's faulty memory on "being asked irrelevant questions out of the cold." *See* Response, Docket Entry [57], at 11.

Of course, as the parties later learned, only two weeks prior to his deposition, Mr. Eckland spent $85,000 on the purchase of a horse in two separate wire transactions of $50,000 and $35,000 on June 17, 2008. The court is left to wonder how difficult it is to recall an $85,000 horse purchase less than 15 days after it occurred. But in opposition to Plaintiff's motion to enforce the subpoena, Defendants valiantly marched on and argued that "[t]here is no factual support whatsoever to the Plaintiffs [sic] allegations of . . . mortgaging properties and hiding money." *See* Response, Docket Entry [57], at 3.

On October 30, 2008, Magistrate Judge Vineyard issued an order addressing the multitude of subpoena disputes among the parties. Magistrate Judge Vineyard found that while some financial records might be relevant, Plaintiff's subpoena was overbroad. *See* Order, Docket Entry [87], at 11. He found that Plaintiff's request Nos. 1-8 were properly targeted and directed Mr. Eckland and his law firm to respond to them within fifteen days from the date of his order. *Id.* at 14. The Magistrate Judge concluded, however, that Mr. Eckland and his law firm were not required to respond to request Nos. 9 through 12. Because it is later particularly relevant, the court sets out the entirety of Paragraph No. 2:

5

> All financial records (including cancelled checks, check stubs, check registers, bank statements and other documents) that reflect any disbursement or present whereabouts of the proceeds of the mortgage, in the approximate amount of $150,000, taken out on the property located at 2362 River Ridge Road, Martin, GA.

*See* Report & Recommendation, at 49.

On November 18, 2008, Plaintiff filed a motion for civil and criminal contempt against Mr. Eckland and the Atlanta Real Estate Law Group, among other entities. Plaintiff contended that upon direction of their counsel, Mr. Eckland and his firm had only turned over only a small portion (eight pages) of the requested documents. Specifically, Plaintiff noted that despite the little information Mr. Eckland provided in his deposition about where the $150,000 mortgage proceeds may have gone, he did not produce any records to document the payment of credit card bills (other than $700). *See* Motion for Contempt, Docket Entry [94], at 11. Other documents Mr. Eckland produced show a credit card bill to Bank of America in the amount of $21,000 and the purchase out of his IOLTA account of two horses at $85,000. *Id.* at 11-12.[2]

On July 10, 2009, after holding a hearing, Magistrate Judge Vineyard issued an order in *Smith* addressing various pending motions, including Plaintiff's motion for contempt against Mr. Eckland and his law firm. *See* Order, Docket Entry [116]. The Magistrate

---

[2]The looseness with which Mr. Eckland has treated his IOLTA account is evidenced throughout these proceedings. Just because the court focuses its attention on other matters should not diminish the seriousness of this problem for Mr. Eckland.

6

Judge found that with respect to paragraph 4 of the subpoenas, Mr. Eckland and his firm "failed to respond as ordered by the Court." *Id.* at 57. The Magistrate Judge further noted that despite the fact that Mr. Eckland had testified in his deposition that he could get a list of creditors he paid with the proceeds of the $150,000, mortgage, he only produced to Plaintiff five documents which showed his firm paying off debts totaling $6,400. *Id.* at 59. "Thus, it is apparent th[a]t Eckland did not produce all of the documents he testified were in his possession and were sought in paragraphs 2 and 3 of the subpoenas." *Id.* The Magistrate Judge concluded: "Based on the foregoing, plaintiff has sufficiently established a *prima facie* case that Eckland, the [Atlanta Real Estate Law Group], and Ates failed to comply with the Court's October 30, 2008, Order, by failing to produce responsive documents to paragraphs 2 through 5 of the subpoenas issued to Eckland and ARELG." *Id.* at 60-61. Because Defendants did not explain their failure, the Magistrate Judge certified the matter for civil sanctions against Mr. Eckland and his law firm. *Id.* at 61. The Magistrate Judge declined to recommend criminal sanctions. *Id.* at 62 n.23.

Mr. Eckland and his firm filed no objections to the Report and Recommendation. On August 31, 2009, the court agreed with the recommendation of the Magistrate Judge and ordered Mr. Eckland and his firm to "show cause why civil contempt sanctions should not be entered against them for failure to comply with the October 30, 2008, order of Magistrate Judge Russell G. Vineyard." *See* Order, Docket Entry [126], at 8. The court set a hearing

7

down for September 30, 2009. At that hearing, the court ruled that the disputes on paragraphs 3 and 4 would be moot so long as Mr. Ates provided a verified response to Plaintiff. On paragraph 5, the court found that no sanctions would be imposed, so long as Mr. Eckland searched his own files and those of his law firm to produce any documents or provided a verified response that the search was made and no documents were found. Finally, the court found that Mr. Eckland was in contempt with respect to Paragraph 2 and would be fined $150 per day beginning on September 30, 2009, until the production of the records as ordered or satisfactory efforts were made to obtain the records. *See* Minute Entry, September 30, 2009.

At the conclusion of the *Forsberg* trial on October 16, 2009, the court directed Plaintiff's counsel to provide the court with (1) an affidavit indicating whether Mr. Eckland had purged his contempt and (2) a recommendation for any additional action by the court. In response, on October 20, 2009, Plaintiff filed a motion to continue contempt sanctions against Mr. Eckland and the Atlanta Real Estate Law Group. That motion showed that on October 5, 2009, Mr. Eckland produced several documents to Plaintiff, including a Settlement Statement for the closing of the River Ridge mortgage. The Settlement Statement shows that Mr. Eckland took out an approximately $150,000 mortgage on the River Ridge property on June 17, 2008, and that the mortgagor was Defendant AME. *See* Plaintiff's Motion to Continue Contempt, Docket Entry [136], at 3. Mr. Eckland also

produced a First Disbursement Statement which is a document created by him which purports to show the deposit of the River Ridge mortgage proceeds into his Firm's IOLTA Account and then a series of 24 transactions which purport to explain where the money was disbursed from the IOLTA account. *Id.* This First Disbursement Statement did not include any back up documentation such as cancelled checks, deposit slips, or bank statements. *Id.*

On October 19, 2009, Mr. Eckland produced a Second Disbursement Statement that shows an increased amount for the mortgage proceeds being deposited into his firm's IOLTA account and an additional disbursement transaction. *Id.* at 4. At the same time he produced the Second Disbursement Statement, he also produced a highly redacted monthly bank statement from his Wachovia IOLTA account. This statement shows a transfer of funds from National City Bank to his IOLTA account of $149,208.90 that matches the new amount of mortgage proceeds noted on the Second Disbursement Statement. *Id.* at 5. While the "date" column on this IOLTA statement is redacted, the description of the wire transfer shows that it was made on April 3, 2008. *Id.* This date is, of course, two months before the supposed $150,000 mortgage was taken out on River Ridge on June 17, 2008, as shown on the Settlement Statement. *Id.* at 5-6.

On October 14, 2009, Mr. Eckland also provided a verified sworn statement to Plaintiff which is dated October 2, 2009. Mr. Eckland states that the mortgage on the River Ridge property was $150,000. *See* Eckland Statement, dated October 2, 2009, at 1. "I am

9

AO 72A
(Rev.8/82)

enclosing a copy of the disbursement statement for this transaction, including the disbursements of this transaction and the verification of the disbursements. As noted, the date of each wire transfer is listed along with the corresponding dollar amount of monies disbursed. In preparing the documentation attached, I *reviewed* all of the bank account transactions for the period in question, including the wire transfers and check disbursements for the disbursing checking account, the operating and accounts payable checking accounts for Atlanta Real Estate Law Group, LLC and the records of the deposits corresponding to the individual disbursements into my personal account." *Id.* 1-2 (emphasis added).

Before addressing the substantive problems of the documents created by Mr. Eckland, the court notes that Paragraph No. 2 did *not* ask for Mr. Eckland to create any disbursement statements, rather the request asked for "all financial records (including cancelled checks, check stubs, check registers, bank statements and other documents)." Thus, the court is at a loss to imagine why Mr. Eckland did not turn over the wire transfers, check disbursements, and checking account statements that he obviously had in his possession and why, instead, he simply "reviewed" them. It is not up to Mr. Eckland to re-write the subpoena request to suit his needs. The court ordered, on numerous occasions, that Mr. Eckland respond in full to the request. Mr. Eckland claims his document creation of disbursement statements was done for Plaintiff's "aid," *see* Response to Motion to Compel, Docket Entry [167], at 4, and "clarity." *See* Response, Docket Entry [147], at 5. As the parties are far past the point of

10

"aid" and it has become necessary to pin Mr. Eckland's testimony down on all four corners with contemporaneous, and if possible, third party, documentation, the court reminds Mr. Eckland that it would behoove him to simply follow the instructions of the court. Clarity generally follows from the documents themselves, as opposed to Mr. Eckland's summary of them.

Mr. Eckland, as always, has an explanation for all of the problematic facts. (Although this time, he offered his explanation through the argument of counsel in a response brief and not via sworn testimony. *See* Response, Docket Entry [147], at 3-4.) He had originally intended to mortgage a property he owned in Florida, and not the River Ridge property. The Florida transaction was in the works when property values began to decline in Florida, so Mr. Eckland decided to mortgage the River Ridge property instead. This is why National City wired money on April 3, 2008 for a mortgage closing that occurred on June 17, 2008. The court is not aware of many banks that would forward the proceeds of a mortgage transaction two months before the closing occurred.

Mr. Eckland continues to state that the 26th Street property is not indicative of any fraud. Mr. Eckland asserts that although Mr. Pefanis purchased the house on May 30, 2007, it was transferred by quitclaim deed to Mr. Eckland with the other properties on June 1, 2007. The original deed was not recorded until July 27, 2007, due to recording gap issues in Fulton County, but the property had already been transferred by quitclaim deed by that

11

point. It raises the question, however, of why Mr. Pefanis purchased the property in his name at the exact time that he and Mr. Eckland had determined to place all of their property in Mr. Eckland's name. This recitation leaves aside, for the moment, all of the issues of whether assets have been transferred out of AME and Mr. Pefanis to LendX and its partial owner, Mr. Eckland.

After all of this motioning before the court, repeated hearings, incalculable hours spent by Plaintiff's counsel and the court, and after the court directly put Mr. Eckland on notice that if he did not fully and accurately respond to his legal obligations, the court would consider referring the matter to the United States Attorney's Office, a few more cracks appear in the facade of the tale. On November 20, 2009, the court held a hearing on Plaintiff's motion to continue contempt against Mr. Eckland. At that hearing, Plaintiff presented evidence to show that most of what Mr. Eckland had been offering to this point in the litigation was a complete fabrication. There, Plaintiff presented the records from Mr. Eckland's IOLTA account for April 2008.

Mr. Eckland's theory all along has been that the mortgage proceeds were approximately $150,000 and that he disbursed the money from his firm's IOLTA account to pay off various creditors that he could or could not remember. Of course, this theory was suspect because one would have to believe that the bank wired the mortgage funds two months before mortgage actually closed on the property. One would also have to take Mr.

12

Eckland at his word – which the court is loathe to do at this stage of the litigation – on his First and Second Disbursement Statements, documents both created after the fact by Mr. Eckland and lacking any contemporaneous support such as bank accounts, deposit slips, or receipts.

But now, it is clear that the entire underpinning of this theory has no basis in fact. Rather, Mr. Eckland's IOLTA account statements show the proceeds for the mortgage of $149,208.90 being wired in on April 3, 2008. Only eight days later on April 11, 2008, that precise amount of money is wired to Mr. Eckland's firm's *operating* account. This fact makes it impossible that the disbursements were made from Mr. Eckland's IOLTA account – as he testified on numerous occasions.

Thus far, Mr. Eckland has avoided the subject of the April 11, 2008, wire transfer from his IOLTA account to his firm's operating account. To sidestep the issue, Mr. Eckland asserts that the "ultimate destination" of the funds that were disbursed was "a" bank account jointly owned by Defendant Pefanis and Mr. Eckland. *See* Response, Docket Entry [167], at 5. But there is no evidentiary or documentary foundation for this assertion. Rather, it is simply another of the shifting sands: Mr. Eckland first claims the money went out of his IOLTA account to various places he could not really recall (including an $85,000 horse payment made only days before); then he creates "disbursement statements" to purportedly show how this money was spent from his IOLTA account. When Plaintiff finds

documentary evidence to show that the money left the IOLTA account only 8 days after it was put in and was wired to Mr. Eckland's firm operating account, Mr. Eckland falls back to the "ultimate destination" of the money being his joint back account. Mr. Eckland has been able to offer these constantly shifting explanations because he never provides any documentary support for any of his assertions, forcing Plaintiff to investigate and demonstrate that the current explanation cannot possibly be true. At which point, Mr. Eckland simply comes up with another story which Plaintiff must chase down.[3]

Plaintiff recently obtained further evidence to support his contention that Mr. Eckland has been less than forthright with the court about the River Ridge property – a mortgage note dated June 17, 2008, which shows a $180,000 mortgage on the property. *See* Reply Brief Motion to Compel, Docket Entry [168], Exh. A. This is in direct conflict with Mr. Eckland's sworn statement that the mortgage on the River Ridge property was $150,000. *See* Eckland Statement, dated October 2, 2009, at 1.

**Motion to Compel**

---

[3]As an aside, the court notes that in more recent times, Mr. Eckland has asserted that the only account he holds is his joint account with Defendant Pefanis. *See* Response, Docket Entry [167], at 6 n.2 ("Eckland notes that, as far as his personal bank accounts go, Plaintiff is already in possession of records of his joint account with Jim Pefanis. Until approximately one month ago, Eckland did not have a personal bank account other than that joint account.") This would appear to be inconsistent with Mr. Eckland's statement made in objection to Plaintiff's subpoena. There, he asserted that "[w]hile he is Mr. Pefanis' partner, he keeps separate bank accounts" and his confidential records, therefore, would have "no bearing or relevance on any issues in the Smith case." *See* Objection, Docket Entry [36], at 1.

Based on the less-than-stellar record of Mr. Eckland's candor before the court to this point – and at the court's invitation – Plaintiff now seeks additional documentation in hopes of tracking financial proceeds. The court has numbered these requests for ease of reference.

1. Produce his bank statements and cancelled checks for all personal and business bank accounts that he has owned since December 1, 2007 (including all bank accounts belonging to Atlanta Real Estate Law Group, or any other business entity in which he has a full or partial ownership interest and including all bank accounts that he jointly holds with Pefanis).

2. Produce all financial records (including cancelled checks) reflecting any monthly payments for River Ridge mortgage since April 2008

3. Produce his 2007 and 2008 personal and business tax returns, so that they may be examined to determine whether they are consistent with Eckland receiving a mortgage on River Ridge (and consistent with Pefanis transferring property to him at any time in 2007 or 2008)

4. Produce all documents reflecting the formation and current and past ownership structure for LendX (and any other mortgage company that he currently owns, in part or in whole);

15

5. Produce all documents reflecting the capital contributions and any asset transfers to LendX (and any other mortgage company that Eckland currently owns, in part or in whole) from any source.

6. Produce all financial records (including financial statements, bank statements, cancelled checks, deposits slips and other financial records) for LendX (and any other mortgage company that he currently owns, in part or in whole);

7. Appear for deposition by Plaintiff's Counsel within ten (10) days of the Court's Order.

Mr. Eckland and Defendants oppose this motion to compel arguing that (1) Mr. Eckland has produced all documents in response to Paragraph No. 2; (2) the production of documents is not a remedy available pursuant to a motion to compel; (3) the financial records of any business in which Mr. Eckland has an ownership interest, his tax returns, and all corporate and financial records for LendX are irrelevant to the instant sexual harassment lawsuit; (4) Plaintiff is not entitled to such overbroad discovery of a non-party's finances; and (5) the Magistrate Judge previously rejected Plaintiff's discovery requests for the bank records for all of Mr. Eckland's accounts and the accounts of his law firm.

The court disposes first of Mr. Eckland's and Defendants' contention that because Magistrate Judge Vineyard limited the scope of the production required under the subpoena back on October 30, 2008, the court should not now order a broader scope of production in

16

Plaintiff's latest motion to compel. The court is confident that when he made his rulings, Magistrate Judge Vineyard was not aware of the full scope of prevarication that has occurred in this litigation. In any event, what he may have ruled in October 2008 is no bar to this court ordering broader discovery now.

Next, Plaintiff is correct that the court directed Plaintiff to file a motion to compel in the *Smith* litigation should Plaintiff believe that additional documentation had not been produced or was now necessary. Because Plaintiff filed this motion at court direction, there can be no procedural irregularities with it, such as Plaintiff failing to file a subpoena.

The court will allow Plaintiff to pursue these discovery requests in the instant *Smith* case because they are related to issues of net worth of Mr. Pefanis and AME – issues with direct relevance to the upcoming *Smith* trial. Mr. Eckland is Defendant Pefanis's domestic partner. Thus, despite the fact that Mr. Eckland is an attorney and money appears to have flowed in and out of his firm's IOLTA account, the court is not faced with an issue of attorney-client privilege. Rather, the relationship between Mr. Eckland and Defendant Pefanis is akin to the husband and wife relationship which has been known to facilitate the hiding of assets. Thus, as to those requests directed at Mr. Eckland, personally, the court finds that Plaintiff is entitled to see if any funds flowed to or for the benefit of Defendant Pefanis.

17

As to the requests directed at information concerning LendX, the court grants them with the following caveat. The court understands LendX to be a limited liability corporation owned by Mr. Eckland and three other individuals. Mr. Eckland is directed to comply with Plaintiff's requests to the extent he has documents in his possession or under his control. Because Mr. Eckland is at least a one-quarter owner of the corporation, the court would expect it likely that he would have these records as well as their being in the possession of the corporation. (The court notes that on December 7, 2009, Plaintiff's counsel subpoenaed LendX Corporation as part of the post-judgment discovery in *Forsberg*.)

**Conclusion**

The court GRANTS Plaintiff's motion to compel [157]. Mr. Eckland is DIRECTED to produce the requested documents by January 4, 2010.

**IT IS SO ORDERED** this 15th day of December 2009.

                                            /s J. Owen Forrester
                                            J. OWEN FORRESTER
                                      SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)